1

2                                                                O

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   OSMIN NAHUM CALDRON,          )   Case No. CV 11-01678-OP
                    Plaintiff,      )
12                                  )
              v.                    )   MEMORANDUM OPINION AND
13                                  )   ORDER
     MICHAEL J. ASTRUE,             )
14   Commissioner of Social         )
     Security,                      )
15                                  )
                    Defendant.      )
16   ───────────────────────────   )

17        The Court[1] now rules as follows with respect to the two disputed issues

18   listed in the Joint Stipulation ("JS").[2]

19

20

21   ─────────────────────

22        [1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed
     before the United States Magistrate Judge in the current action.  (ECF Nos. 6,
23   7.)

24        [2]  As the Court advised the parties in its Case Management Order, the
25   decision in this case is being made on the basis of the pleadings, the
     Administrative Record and the Joint Stipulation filed by the parties.  In
26   accordance with Rule 12(c) of the Federal Rules of Civil Procedure, the Court
27   has determined which party is entitled to judgment under the standards set
     forth in 42 U.S.C. § 405(g).  (ECF No. 4 at 3.)
28

1

**I.**

**DISPUTED ISSUES**

As reflected in the Joint Stipulation, the disputed issues which Plaintiff is raising as the grounds for reversal and/or remand are as follows:

(1)    Whether the Administrative Law Judge ("ALJ") should have afforded the opinion of the treating specialists controlling weight; and

(2)    Whether the ALJ properly evaluated Plaintiff's subjective pain complaints.

(JS at 3.)

**II.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 575-76 (9th Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (citation omitted). The Court must review the record as a whole and consider adverse as well as supporting evidence. Green v. Heckler, 803 F.2d 528, 529-30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984).

/ / /

/ / /

**III.**

**DISCUSSION**

**A.      The ALJ's Findings.**

The ALJ found that Plaintiff has the severe impairments of status post-lumbar discectomy and herniated discs.  (AR at 13.)  The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, limited to lifting and/or carrying ten pounds occasionally; sitting six hours in an eight-hour workday; standing and/or walking two hours in an eight-hour workday with a stand/sit option; pushing, pulling, kneeling, bending, stooping, and climbing stairs occasionally; and never climbing ladders, ropes, or scaffolds.  (Id. at 17.)

Relying on the testimony of the vocational expert ("VE"), the ALJ determined Plaintiff was able to perform his past relevant work as a surveillance system monitor (Dictionary of Occupational Titles ("DOT") No. 379.367-010).  (AR at 21.)

**B.      The ALJ Failed to Properly Evaluate the Medical Evidence in Assessing Plaintiff's RFC.**

**1.      Background.**

Plaintiff was involved in two motor vehicle accidents on November 10, 2006, and again on December 20, 2006.  (Id. at 94.)  He initially received three months chiropractic treatment and physical therapy for his resulting neck and low back pain.  (Id. at 94, 238.)

On March 9, 2007, Plaintiff underwent an MRI of the lumbar spine.  The MRI revealed spondylolisthesis at L5/S1; mild to moderate disc protrusions impinging on the nerve roots at L5/S1, and at L1/L2; bilateral neuroforaminal narrowing with impingement on the L5 and L1 exiting nerve roots; and bilateral facet arthropathy.  (Id. at 205.)  On April 10, 2007, Plaintiff saw orthopedic spine surgeon, Daniel A. Capen, M.D., who reviewed the MRI and

3

indicated diagnoses of two level discopathy (based on the MRI, which showed multilevel lumbar spine disc protrusions with bilateral neural foraminal stenosis); Grade I spondylolisthesis of L5 on S1; and lumbar sprain/strain syndrome. (Id. at 205-06.) Plaintiff reported to Dr. Capen that he could only sit for about five minutes, and stand and walk for ten minutes before experiencing increased pain. (Id. at 202.) Plaintiff also reported difficulty going up and down stairs. (Id.) Examination revealed tenderness on palpation at the midline, positive sacroiliac stress test on the left, positive straight leg raising on the left, and reduced range of motion. (Id. at 203-04.) Dr. Capen initially recommended steroid injections and pain medication, and Plaintiff underwent a series of epidural injections on July 6, July 10, and August 3, 2007. (Id. at 264-69.)

On August 14, 2007, on re-examination, Dr. Capen noted that the three epidural injections had not relieved Plaintiff's pain. (Id. at 197.) At that point in time, Plaintiff "[was] still working, and is able to work." (Id.) Examination revealed range of motion that was "quite good," but some tightness, and some pain on bend and rotation. (Id. at 198.)

Plaintiff continued to work until October 9, 2007, his alleged date of onset. (Id.)

On November 13, 2007, Dr. Capen re-evaluated Plaintiff for surgical intervention. (Id. at 194-96.) He again noted that the three lumbar epidural steroid injections failed to adequately relieve Plaintiff of his symptoms. (Id. at 194.) Physical examination revealed tenderness to palpation over the midline, spasm, guarding, pain with range of motion testing, and positive straight leg raising on the left. (Id. at 195.) He noted that Plaintiff's injury left "dysfunction, disability and chronic pain." (Id.) He reported that therapy, medications, and all conservative treatments, including steroid injections, had failed. (Id.) He informed Plaintiff that he had the choice of "attempting to live

4

1  with the pain or undergoing surgical intervention . . ." with no guarantee of

2  complete or even partial relief.  (Id.)

3          After that date, Plaintiff regularly saw Dr. Capen, or others in his office,

4  for follow-up and medication management while waiting for authorization for

5  surgery.  On December 4, 2007, physical examination found lumbar spine

6  midline tenderness, spasm, and pain on range of motion testing.  (Id. at 192.)

7  Dr. Capen opined that Plaintiff "remains temporarily totally disabled."  (Id.)  In

8  January 2008, Dr. Capen found pain and tenderness in the paralumbar region;

9  noted that Plaintiff ambulated with an "essentially normal gait"; experienced

10  increased pain on heel and toe walk attempts; and exhibited positive straight

11  leg raise bilaterally.  (Id. at 189.)  He again opined that Plaintiff was

12  temporarily totally disabled.  (Id.)  In February 2008, Dr. Capen noted ongoing

13  spasm, tightness, tenderness, and limited range of motion of the lumbar spine.

14  (Id. at 185-86.)  In April 2008, Dr. Jarminski, filling in for Dr. Capen, found

15  continued paralumbar muscle tenderness, guarding, limited range of motion of

16  the lumbar spine, increased low back pain on heel/toe walk attempts, and

17  positive bilateral straight leg raising.  (Id. at 183.)  In May 2008, the

18  physician's assistant who examined Plaintiff under the direction and

19  supervision of Dr. Capen, noted restricted range of motion of the lumbar spine,

20  spasm, midline tenderness, positive straight leg raise bilaterally, and

21  ambulation with an antalgic short-stepped gait.  (Id. at 180.)  In June 2008,

22  Plaintiff was found to have a positive bilateral straight leg raise, continuously

23  worse on the left side, and range of motion that is "still continuously stiff, achy

24  and limited secondary to pain."  (Id. at 177.)  In July 2008, the findings were

25  similar and Dr. Capen again stated that nothing else could be done for Plaintiff

26  short of surgery, for which Plaintiff was still awaiting authorization.  (Id. at

27  174.)  Dr. Smith later reported that in mid-2008 Plaintiff "was declared

28  permanent and stationary."  (Id. at 238.)

As of September 9, 2008, Plaintiff was still awaiting authorization for the surgery.  (Id. at 211.)  On that date, Dr. Capen reiterated Plaintiff's need for authorization for surgical intervention in the form of a posterior lumbar interbody fusion at L4-5 and L5-S1.  (Id. at 212.)

On September 14, 2008, Plaintiff underwent a consultative orthopedic examination, performed by orthopedic surgeon, Carlos Gonzalez, M.D.[3]  (Id. at 217.)  Dr. Gonzalez reviewed x-rays, apparently taken by his office, which found only mild degenerative change over L5/S1 and L4-5; there is no indication that he reviewed Plaintiff's 2007 MRI or any of Plaintiff's other medical records.  (Id. at 220.)  Dr. Gonzales found Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; could push and pull on a frequent basis with appropriate weight; could stand, walk, and sit without limitations; did not require an assistive ambulatory device; could bend, kneel, stoop, crawl, and crouch on a frequent basis; and could perform overhead activities.  (Id. at 221.)  This would constitute medium-level work.  DOT, Fourth Ed. 1991, App. C.

On October 23, 2008, state agency evaluator, N.J. Rubaum, M.D., indicated that Plaintiff's primary diagnosis was low back pain.  (AR at 222.)  The case analysis form submitted to Dr. Rubaum references receipt of Dr. Capen's records dated April 2007 through July 2008.  (Id. at 228.)  The case analysis form also summarizes the findings of the "CE" (consulting examiner, Dr. Gonzalez), but fails to reflect any of the findings or conclusions from Dr. Capen's reports.  (Id.)  Presumably, after reviewing both Dr. Gonzalez's report and Dr. Capen's records, Dr. Rubaum completed a Physical Residual Functional Capacity Assessment, a check-box form, wherein he indicated that

---

[3]  Plaintiff notes that Dr. Gonzalez is not board certified.  (JS at 6; see also AR at 221.)

6

Plaintiff could lift and/or carry fifty pounds occasionally, twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; and could climb ramps/stairs, ladder/rope/ scaffolds, balance, stoop, kneel, crouch, and crawl frequently.  (Id. at 223-26.)  This would constitute medium-level work.  DOT, Fourth Ed. 1991, App. C.  Dr. Rubaum also opined, without explanation, that "claimant's credibility is seriously in doubt."  (Id. at 227.)  Moreover, Dr. Rubaum indicated that the "treating or examining source statement(s) regarding the claimant's physical capabilities" were in the file, but he also indicated that the "treating/examining source conclusions about the claimant's limitations or restrictions" were *not* significantly different from his own findings.  (Id.)  While this is true with respect to examining source Dr. Gonzalez's conclusions, as Dr. Rubaum's conclusions essentially mirror those of Dr. Gonzalez, it certainly is *not* true with respect to the treating source conclusions.  Thus, the Court finds the record ambiguous as to whether Dr. Rubaum actually reviewed the records from Plaintiff's treating physician, Dr. Capen, prior to completing the assessment.

On March 23, 2009, Plaintiff was seen by orthopedic surgeon Michael Smith, M.D.  (Id. at 237.)  Dr. Smith reviewed the 2007 MRI and diagnosed chronic, symptomatic, post-traumatic injury of the lumbar spine, with lower lumbar musculotendino-ligamentous involvement; right and left posterior joint damage; and multilevel disc protrusions.  (Id. at 242.)  Based on his examination, he noted objective findings of tenderness to palpation, reduced range of motion of the lumbosacral spine, and positive straight leg raising in the seated and supine positions.  (Id. a 239-42.)

On April 3, 2009, Plaintiff obtained another MRI.  (Id. at 258.)

On April 8, 2009, Plaintiff was seen by neurosurgeon Ian Armstrong, M.D.  (Id. at 271-73.)  Dr. Armstrong reviewed the new MRI and found evidence of an L5/S1 disc protrusion and extrusion.  (Id. at 271.)  He also

7

1    found evidence of a disc protrusion at the L4-L5 level.  (<u>Id.</u>)  He diagnosed

2    herniating lumbar discs at L4-5 and L5/S1, and to a lesser degree at L3-4; and

3    lumbar radiculopathy in both lower extremities.  (<u>Id.</u> at 272.)  He recommended

4    lumbar discectomy at the L4-5 and L5-S1 levels.  (<u>Id.</u>)

5        On May 6, 2009, Plaintiff again saw Dr. Smith.  (<u>Id.</u> at 258.)  Dr. Smith

6    reviewed the updated MRI and Dr. Armstrong's report, and noted the

7    recommendation for lumbar disc surgery.  (<u>Id.</u>)

8        On May 26, 2009, Dr. Armstrong performed lumbar surgery.  (<u>Id.</u> at 274-

9    76.)  During surgery, he found that Plaintiff "had a very large free fragment of

10    herniated disc at L5-S1, central to right-sided described as a massive free

11    fragment, disrupted disc, collapsed disc."  (<u>Id.</u> at 274.)  He found "facet

12    arthropathy bilaterally and lateral recess stenosis contributing to the patient's

13    problems."  (<u>Id.</u>)  Additionally, there was "collapse in the up-down direction of

14    the disc space," and at L4-L5 "there was some facet arthropathy left-sided,

15    affecting the ligament and left-sided subligamentous herniation, approximately

16    5 mm."  (<u>Id.</u>)

17        On June 5, 2009, post-surgery, Plaintiff again saw Dr. Smith who

18    reported that Plaintiff "had mild pain and was using a walker."  (<u>Id.</u> at 258.)

19    On September 9, 2009, he was followed-up by Dr. Armstrong, "was doing

20    well," and medication was prescribed.  (<u>Id.</u>)  On October 9, 2009, he again saw

21    Dr. Smith, who noted "some residual pain."  (<u>Id.</u>)  At that time, Dr. Smith

22    diagnosed "chronic, symptomatic, posttraumatic injury of the lumbar spine

23    (status post surgery)."  (<u>Id.</u> at 261.)  He concluded that the residuals continued

24    because of the nature of the original accident, the condition was permanent,

25    and Plaintiff would have continuing problems in the future.  (<u>Id.</u>)  He stated

26    that Plaintiff would require a modification in his activities of daily living and

27    employment, and should avoid strenuous lifting, carrying, pushing and pulling,

28    repetitive or prolonged bending and twisting; he should limit squatting, stair

1  climbing, and sitting for extended periods.  (Id.).  He further noted that Plaintiff
2  "even has trouble with extended periods of walking and standing."  (Id.)

3      On February 16, 2010, Dr. Smith completed a Lumbar Spine Impairment
4  Questionnaire.  (Id. at 279-84.)  He opined that Plaintiff can lift and or carry ten
5  pounds occasionally; sit no more than two hours out of an eight-hour workday;
6  stand and/or walk no more than one hour per eight-hour workday; would need
7  to get up and move around every hour for ten to fifteen minutes; never push,
8  pull, bend, stoop, kneel, or work at heights.  (Id. at 281-84.)  He also opined
9  that Plaintiff would miss work more than three times per month due to his
10  impairments.  (Id. at 283.)

11      **2.    Legal Standard.**

12      It is well-established in the Ninth Circuit that a treating physician's
13  opinions are entitled to special weight, because a treating physician is
14  employed to cure and has a greater opportunity to know and observe the patient
15  as an individual.  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).
16  "The treating physician's opinion is not, however, necessarily conclusive as to
17  either a physical condition or the ultimate issue of disability."  Magallanes v.
18  Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  The weight given a treating
19  physician's opinion depends on whether it is supported by sufficient medical
20  data and is consistent with other evidence in the record.  See 20 C.F.R. §
21  404.1527(d)(2).  If the treating physician's opinion is uncontroverted by
22  another doctor, it may be rejected only for "clear and convincing" reasons.
23  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); Baxter v. Sullivan, 923 F.2d
24  1391, 1396 (9th Cir. 1991).  Where the treating physician's opinion is
25  controverted, it may be rejected only if the ALJ makes findings setting forth
26  specific and legitimate reasons that are based on the substantial evidence of
27  record.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Magallanes,
28  881 F.2d at 751; Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).

9

1  Contrary opinions of examining and non-examining physicians may "serve as

2  additional specific and legitimate reasons" for rejecting the opinions of treating

3  and examining physicians.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th

4  Cir. 2001).

5         In Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit

6  reiterated and expounded upon its position regarding the ALJ's acceptance of

7  the opinion of an examining physician over that of a treating physician.  "When

8  an examining physician relies on the same clinical findings as a treating

9  physician, but differs only in his or her conclusions, the conclusions of the

10 examining physician are not "'substantial evidence.'"  Orn, 495 F.3d at 632;

11 Murray v. Heckler, 722 F.2d 499, 501-02 (9th Cir. 1983).  "By contrast, when

12 an examining physician provides 'independent clinical findings that differ from

13 the findings of the treating physician' such findings are 'substantial evidence.'"

14 Orn, 495 F.3d at 632; Miller v. Heckler, 770 F.2d 845, 849 (9th Cir. 1985).

15 Independent clinical findings can be either (1) diagnoses that differ from those

16 offered by another physician and that are supported by substantial evidence, see

17 Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1985), or (2) findings based on

18 objective medical tests that the treating physician has not himself considered,

19 see Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

20        If a treating physician's opinion is not giving controlling weight because

21 it is not well supported or because it is inconsistent with other substantial

22 evidence in the record, the ALJ is instructed by 20 C.F.R. section

23 404.1527(d)(2) to consider the factors listed in section 404.1527(d)(2)-(6) in

24 determining what weight to accord the opinion of the treating physician.  Those

25 factors include the "[l]ength of the treatment relationship and the frequency of

26 examination" by the treating physician; and the "nature and extent of the

27 treatment relationship" between the patient and the treating physician.  20

28 C.F.R. 404.1527(d)(2)(i)-(ii).  Other factors include the supportablility of the

opinion, consistency with the record as a whole, the specialization of the physician, and the extent to which the physician is familiar with disability programs and evidentiary requirements.  Id. § 404.1527(d)(3)-(6).  Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to deference."  Soc. Sec. Ruling 96-2p; Orn, 495 F.3d at 632-33.  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  Soc. Sec. Ruling 96-2p; Orn, 495 F.3d at 633.  .

     **3.**  **Analysis.**

     Plaintiff contends that the ALJ should have afforded greater weight to the opinions of Plaintiff's treating specialists, Drs. Capen and Smith ("Treating Physicians").  (JS at 3-9.)  Plaintiff claims the ALJ rejected these opinions and instead credited the opinions of the consultative examining doctor, Dr. Gonzalez, who examined Plaintiff on September 14, 2008, but did not review any of Plaintiff's medical records, and the state agency doctor, Dr. Rubaum, who Plaintiff claims only reviewed the record up to October 2008[4] ("Examining Physicians").  (Id. at 9.)  Plaintiff further contends that the ALJ wrongly stated that Plaintiff's MRIs failed to show any significant abnormalities.  (Id.)  Finally, he states that because the ALJ found that the fact of Plaintiff's May 2009 back surgery "suggests that [his] symptoms were genuine," and also that Plaintiff's May 2009 surgery was "generally successful in relieving the symptoms," at the very least the ALJ should have found Plaintiff disabled for a closed period from the date of his December 2006

---

    [4]  As previously noted, this Court finds the evidence ambiguous as to whether Dr. Rubaum actually reviewed anything other than Dr. Gonzalez's September 2008 report and conclusions.  (See Discussion supra Part III.B.1.)

1   accident until a reasonable time after his May 2009 surgery.  (Id.)

2          The ALJ stated that she gave "greater weight" to the opinions of the

3   Examining Physicians over the opinions of the Treating Physicians for the

4   following reasons:  (1) although the Treating Physicians' treatment notes did

5   not reflect "drastic deterioration," their assessment of Plaintiff's RFC grew

6   more restrictive over time; thus, their assessed limitations were out of

7   proportion with their objective findings; (2) the opinions of the Treating

8   Physicians regarding whether Plaintiff is disabled, or unable to work, are

9   reserved to the Commissioner; thus, Dr. Capen's statement that Plaintiff was

10  "temporarily totally disabled" was not entitled to controlling weight; and (3)

11  the opinions of the Treating Physicians "contrast sharply" with other evidence

12  of record, rendering them less persuasive.  (AR at 19-20.)

13          a.     **The Examining Physicians' Opinions Do Not Constitute**

14                 **Substantial Evidence and Were Not Entitled to**

15                 **Significant Weight**

16          Preliminarily, the Court finds that the ALJ erred in assigning significant

17  weight to the opinions of the Examining Physicians, one-time examiners at

18  least one of whom apparently did not even review Plaintiff's medical records.[5]

19  In fact, even if Dr. Rubaum was provided with Dr. Capen's notes, he appears to

20

21          [5]  Dr. Gonzalez arguably should have been provided with Plaintiff's

22  medical records.  See 20 C.F.R. §§ 404.1517, 416.917 ("If we arrange for [a

23  consultative] examination or test . . . [w]e will also give the examiner any

     necessary background information about your condition.").  Moreover, there

24  is some authority providing that when examining physicians fail to review a

25  plaintiff's records, their opinions do not constitute substantial evidence that

26  could justify rejecting the opinions of treating physicians.  See, e.g., Bayliss v.

     Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (affirming the ALJ's rejection

27  of psychological assessments by doctors who did not review objective

28  medical data or reports from treating physicians or counselors).

1   have relied solely on the same evidence as Dr. Gonzalez in making his RFC
2   assessment – i.e., Dr. Gonzalez's x-rays and examination.
3        Dr. Gonzalez talked to Plaintiff about the history of his condition, took
4   some x-rays, and performed his own examinations:  orthopedic, cervical range
5   of motion, upper extremity range of motion, thoracolumbar range of motion,
6   lower extremity range of motion, and neurological – the same tests performed
7   by Plaintiff's Treating Physicians.  However, despite being informed by
8   Plaintiff that he had a long history of pain and was a candidate for surgical
9   decompression, and that more conservative treatments had provided only
10  temporary pain relief, and despite finding that Plaintiff's examination was
11  significant for decreased range of motion of his thoracolumbar spine, as well as
12  severe tenderness on palpation, and severe low back pain when performing a
13  Spurling test (used to test bilateral upper extremity radiculopathy), Dr.
14  Gonzalez nevertheless concluded that Plaintiff could lift and carry twenty-five
15  pounds frequently, and fifty pounds occasionally, could stand, walk and sit
16  without limitation, and could bend, kneel, stoop, crawl, and crouch on a
17  frequent basis.  Although Dr. Gonzalez's tests and clinical findings virtually
18  mirrored those of the Treating Physicians, his conclusions, and those of Dr.
19  Rubaum, were different from the conclusions of the Treating Physicians.
20  Accordingly, the conclusions of the Examining Physicians are not considered
21  "substantial evidence," and the ALJ's reliance on them was error  Orn, 495
22  F.3d at 632.
23       Moreover, given the record as a whole, together with the fact that the
24  Examining Physicians did not review Plaintiff's medical records, the Court
25  finds the Examining Physicians' conclusions incongruous and not based on
26  substantial evidence of record.  This seems particularly true here where the
27  Treating Physician's records and opinions span from early in 2007 until well
28  over a year past the one-time evaluations of the Examining Physicians, and

1  well past Plaintiff's May 26, 2009, surgery.  In fact, no consulting examination

2  was ever conducted after the surgery.  Thus, the post-surgical examinations of

3  Plaintiff's treating doctors are uncontradicted.

4       As a result, the Examining Physicians' opinions cannot be the basis for

5  rejecting the opinions of the Treating Physicians, which, therefore, must be

6  considered uncontradicted.  As a result, the ALJ could only reject those

7  opinions on the basis of clear and convincing reasons supported by substantial

8  evidence.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996).  As discussed

9  below, the Court finds that the reasons given by the ALJ for rejecting the

10  opinions of the Treating Physicians are vague and conclusory at best, and

11  unsupported by any evidence.

12       **b.**   **<u>The Reasons Given for Rejecting the Opinions of the</u>**

13  **<u>Treating Physicians Were Not Clear and Convincing</u>.**

14       With regard to Plaintiff's limitations, in late 2007, Dr. Capen found

15  Plaintiff to be "temporarily totally disabled" and a candidate for lumbar disc

16  surgery.  (AR at 189, 192.)  Sometime in mid-2008, Plaintiff was found to be

17  "permanent and stationary."  (<u>Id.</u> at 238.)  On October 9, 2009, post-surgery,

18  Dr. Smith opined that surgery had been unsuccessful at returning Plaintiff to

19  performing his normal daily activities, and he would require modification of his

20  activities of daily living and employment.  (<u>Id.</u> at 261.)  Dr. Smith stated that

21  Plaintiff should avoid strenuous lifting, carrying, pushing and pulling,

22  repetitive or prolonged bending and twisting; and should limit squatting, stair

23  climbing, walking, standing, and sitting for extended periods.  (<u>Id.</u>)  On

24  February 16, 2010, post-surgery, Dr. Smith opined that Plaintiff could only sit

25  two hours in an eight-hour day and stand for one hour; could lift only ten

26  pounds occasionally; would suffer frequent limitations in concentration,

27  persistence, and pace due to his pain; and would miss work up to three times

28  per month due to his impairments.  (<u>Id.</u> at 282.)

1      The ALJ stated that although the Treating Physicians' assessment of

2  Plaintiff's RFC grew more restrictive over time, their notes did not reflect

3  "drastic deterioration"[6] and, therefore, their assessed limitations appear "out of

4  [pro]portion with the objective findings and the claimant's physical

5  examination results."  (Id. at 20.)  The ALJ also found that their opinions

6  contrasted sharply with other evidence of record, rendering them less

7  persuasive.

8      In support of her reasoning, the ALJ first refers to the fact that the March

9  9, 2007, MRI "showed only mild degenerative disc changes and a mild to

10  moderate disc protrusion."  (Id.)  She then notes:  "Likewise, although there

11  was moderate narrowing of the right neural foramina at the L5-S1 level, the

12  claimant's lumbosacral spine had mild face arthropathy with moderate

13  arthropathy, mild canal narrowing and compression and mild endplate

14  changes."  (Id.)  These vague and conclusory statements, merely parroting the

15  MRI results, fail to provide any support for the ALJ's general proposition.

16  Indeed, the Treating Physicians recommended surgery based in part on this

17  MRI.

18      In fact, it appears that the ALJ is rejecting the Treating Physicians'

19  findings by substituting her own medical conclusions for those of the

20  physicians.  It is inappropriate for the ALJ to do so, particularly where the ALJ

21  did not even seek the testimony of a medical expert.  Tacket v. Apfel, 180 F.3d

22  1094, 1102-03 (9th Cir. 1999) (finding it inappropriate for an ALJ to substitute

23  his own medical judgment for that of a treating physician); see also Day v.

24  Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (noting that hearing examiner

25

26

27      [6] No authority is cited by the ALJ or by the Commissioner to support
the proposition that a "drastic deterioration" in a plaintiff's condition is a

28  necessary condition for an RFC to become more restrictive over time.

1    was not a qualified medical expert).

2         Moreover, the Court is not convinced that the RFCs of the Treating

3    Physicians even changed over time.  During his treatment of Plaintiff, which

4    spanned from early 2007 to August 2008, Dr. Capen repeatedly mentioned that

5    surgery was Plaintiff's only remaining recourse for pain relief.  (AR at 174,

6    177, 179-80, 183, 186 ("There is not any other treatment that I would

7    recommend that would have a likelihood of providing this gentleman with any

8    improvement in his condition."), 189, 192, 195, 215.)  In December 2007 and

9    January 2008, Dr. Capen referred to Plaintiff as "totally temporarily disabled."[7]

10   (Id. at 189, 192.)  Sometime in mid-2008 Plaintiff's condition was determined

11   to be permanent and stationary.  (Id. at 238.)  In March 2009, Dr. Smith noted

12   that there was a reasonable medical probability that Plaintiff would require

13   lumbar epidural blocks and/or disc surgery in the future (id. at 242), and in

14   May 2009, Plaintiff underwent the disc surgery.  In October 2009, Dr. Smith

15   noted that Plaintiff's residual symptoms would continue, that his condition "is

16   permanent and [he] will have continuing problems in the future" necessitating a

17   modification of the activities of daily living and employment.  (Id. at 261.)  He

18   opined that Plaintiff should avoid strenuous lifting, carrying, pushing and

19   pulling, repetitive or prolonged bending and twisting, squatting, stair climbing,

20   sitting for extended periods, and walking and standing for extended periods.

21   _____

22        [7]  In the workmen's compensation arena, "temporarily totally disabled"
23   generally refers to an employee who has been temporarily disabled by an
     industrial injury, and connotes an inability to earn income in the open labor
24   market during the period of recovery.  Herrera v. Workmen's Comp. App.
     Bd., 71 Cal. 2d 254, 427 (1969); see also Rissetto v. Plumbers & Steamfitters
25   Local 343, 94 F.3d 597, 605 (9th Cir. 1996) ("[An employee] is considered
26   temporarily *totally* disabled if he is unable to earn any income during the
27   period when he is recovering from the effects of the injury.") (citation
28   omitted).

(Id.)  None of these opinions differ that greatly from Dr. Smith's 2010 RFC assessment, wherein he more specifically opined that Plaintiff could only sit two hours in an eight-hour day and stand for one hour; could lift only ten pounds occasionally; would suffer frequent limitations in concentration, persistence, and pace due to his pain; and would miss work up to three times per month due to his impairments.  (Id. at 282.)  Thus, the ALJ's finding that the Treating Physicians' RFCs became more restrictive over time is not supported in the record.

Elsewhere in her decision, in support of her conclusions that the Treating Physicians' RFC assessments "contrast sharply" with other evidence of record, and in conjunction with her discussion discounting Plaintiff's credibility, the ALJ references the following:

- "Despite presenting to Dr. Capen with pain and tenderness . . . and positive straight leg raising, the claimant ambulated with an essentially normal gait with normal tendon reflexes at the knees and ankles."  (AR at 18 (citation omitted));

- On March 23, 2009, Dr. Smith found normal muscle tone in the thoracic, lumbar and buttock areas; range of motion in the spine with respect to right bending, left bending, right rotation and left rotation at 100% secondary to only mild pain, upon extension it was 50%  secondary to moderate pain; tandem gait, heel gait, and tiptoe gait were normal; there was no increased pain when claimant changed positions; and standing did not cause increased pain (id. (citation omitted));

- On October 9, 2009, Dr. Smith reported normal range of motion in the claimant's lumbosacral spine with no lower extremity weakness, and he had a normal tandem gait, tiptoe gait, and heel gait; sensation was normal from the waist to the toes; there was no

17

increased pain in the supine or prone positions; hip stability, flexion, rotation, abduction and extension were all normal; and straight leg raising was within normal limits[8] (id. (citation omitted);

- Despite reports of severe tenderness on palpation during the consultative examination, Plaintiff's range of motion was normal, and he had negative straight leg raising bilaterally; motor strength, reflexes and sensation were intact; there were no neurological deficits; he had a normal gait and stance (id. at 18 (citation omitted));

- Dr. Smith's February 16, 2010, opinion "somewhat contradicts" his October 2009 report in which he observed normal range of motion and no lower extremity weakness, and no spasms found, only reported by Plaintiff;

- Dr. Smith "twice reported negative straight leg raising:  once before the claimant's back surgery and once after the surgery" (id. at 20 (citations omitted)); and

- Following surgery, Plaintiff reported only mild weakness and a restricted range of motion only on extension (id. (citation

---

[8]  Whether the straight leg raising results were "within normal limits" on this date is ambiguous at best.  Test results show that Plaintiff was able to raise his legs between 50 and 60 degrees (AR at 261); in March 2009 he was able to raise them between 30 and 40 degrees (id. at 241).  There is a notation "N" in the pain column for the straight leg raising assessment that could mean either "normal or no increase in the symptom if present before the examination."  (AR at 259, 261.)  As there was pain present before the examination (it was rated "moderate" in March 2009), it is quite possible that this is a positive, not a negative, straight leg raising result.  Regardless, it is not clear that the results on October 2010 were "within normal limits."

18

omitted)).

Once again, these examples reflect the ALJ's substitution of her own medical opinion in place of the doctors.  These examples also reflect the ALJ's "cherry picking," leaps of logic, and distortion of the language and findings from Plaintiff's medical records, seemingly in order to support a denial of benefits.  See Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 872-73 (9th Cir. 2008) (administrator of benefit plan did not meet its duty in deciding whether to grant or deny benefits by taking various of the claimant's doctors' statements out of context or otherwise distorting them in an apparent effort to support a denial of benefits).

For instance, the ALJ does not explain why someone with positive straight leg raising should not have "normal muscle tone" or gait, or should have lower extremity weakness or increased pain on changing positions or standing.  Noting only in passing that the results had not been consistent, the ALJ mentions that Dr. Smith[9] twice reported negative straight leg raising (AR at 20);[10] she fails to mention that the Treating Physicians together reported positive straight leg raising at almost every examination on at least seven occasions (April 2007, November 2007, January 2008, April 2008, May 2008, June 2008, and March 2009) (id. at 177, 180, 183, 189, 195, 204, 241).  She states that Dr. Smith's October 2009 opinion is inconsistent with his February 2010 assessment because in 2009, he observed normal range of motion and no lower extremity weakness, and no spasms found, only reported by Plaintiff.

---

[9]  In fact, the pre-surgical report the ALJ refers to was made by Dr. Armstrong, not Dr. Smith.  (AR at 271-72.)

[10]  The straight leg raise is a test of the low back that stretches the nerve root.  The Merck Manual of Diagnosis and Therapy, 1490 (17th Ed. 1999).  A negative result indicates no pain (and thus no nerve involvement) upon this type of movement.  Id.

19

1   (Id. at 20.)  However, Dr. Smith's October 2009 assessment *also* reflected that

2   Plaintiff presented with residual pain, there was no *increased* pain with

3   changing positions or sitting, no *increased* pain in the supine or prone position,

4   he still had mild tenderness to palpation, mild pain on flexion and extension,

5   and an ambiguous straight leg raising result.[11]  As a result of his examination,

6   Dr. Smith concluded that Plaintiff should avoid strenuous lifting, carrying,

7   pushing and pulling, repetitive or prolonged bending and twisting; and should

8   limit squatting, stair climbing, walking, standing, and sitting for extended

9   periods.  (Id. at 257-62.)  Nothing in this October 2009 assessment appears

10  inconsistent with Dr. Smith's 2010 RFC assessment more specifically limiting

11  Plaintiff's lifting, carrying, pushing, pulling, bending, stooping, kneeling,

12  squatting, climbing, walking, standing, and sitting.  The ALJ simply ignores the

13  Treating Physicians' negative findings, which do not "contrast sharply" with

14  their assessed limitations, but which apparently *do* "contrast sharply" with her

15  seemingly desired conclusion.

16        Moreover, the ALJ apparently rejects the Treating Physicians' opinions

17  because the records following Plaintiff's May 2009 surgery suggest some

18  improvement.  As such, she improperly conflates Plaintiff's pre- and post-

19  surgical symptoms, arriving at an RFC that, if anything, tends to reflect

20  Plaintiff's post-surgical status only in the month or two following surgery.

21  This is perhaps most vividly reflected in her statement that "[Plaintiff] did

22  undergo back surgery for the alleged impairment which certainly suggests the

23  symptoms were genuine.  While that fact would normally weigh in the

24  claimant's favor, it is offset by the fact that the record reflects that the surgery

25  was generally successful in relieving the symptoms."  (Id. at 19.)  This makes

26  no logical sense in the context of determining whether Plaintiff was at any

27  _____

28        [11]  See supra note 8.

20

1    point disabled from October 2007 forward – in fact, it would seem to imply that
2    any claimant who finally undergoes surgery or treatment for a long-term
3    problem that is then relieved by that surgery or treatment could not be found
4    disabled prior to that surgery.  In short, the ALJ's statement totally negates any
5    possible pre-surgical impairment based solely on the premise of some later
6    short-term surgical success.  It also totally ignores the opinions of the Treating
7    Physicians that Plaintiff was disabled – temporarily or otherwise – for any
8    period of time either before or after his surgery.  Nor is there any substantial
9    support for the ALJ's statement that Plaintiff's surgery was "generally
10   successful."  Dr. Smith's treatment notes continue for almost six months after
11   the surgery and seem to reflect that any improvement in Plaintiff's condition
12   was short-lived.  This is consistent with Plaintiff's testimony at the hearing that
13   surgery did not help his condition and that, in fact, Dr. Smith was now
14   recommending he undergo a second surgery – fusion on the lower back.  (Id. at
15   63.)  In short, the record on any post-surgery improvement is too ambiguous
16   and undeveloped to constitute a clear and convincing reason for rejecting the
17   Treating Physicians' pre- and post-surgical opinions regarding Plaintiff's
18   limitations.
19          The Court finds that the ALJ improperly gave little weight to the
20   opinions of the Treating Physicians, whose opinions were neither cursory nor
21   inconsistent with the record.  In fact, the inconsistent opinions are those of the
22   Examining Physicians who had either no medical records to review, or at best a
23   limited subset.
24          Based on the foregoing, the Court finds that the ALJ's decision is not
25   supported by substantial evidence and is arguably contrary to the evidence of
26   record.  Thus, the Court finds that this matter must be reversed and remanded
27   for further proceedings to address these issues.
28   / / /

21

**C.     The ALJ Failed to Properly Evaluate Plaintiff's Credibility.**

     **1.     Legal Standard.**

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). When, as here, an ALJ's disbelief of a claimant's testimony is a critical factor in a decision to deny benefits, the ALJ must make explicit credibility findings. Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990); Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981); see also Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (an implicit finding that claimant was not credible is insufficient).

Under the "Cotton test," where the claimant has produced objective medical evidence of an impairment which could reasonably be expected to produce some degree of pain and/or other symptoms, and the record is devoid of any affirmative evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of the claimant's pain and/or other symptoms only if the ALJ makes specific findings stating clear and convincing reasons for doing so. See Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986); see also Smolen, 80 F.3d at 1281; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1991). The ALJ must set forth "findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas, 278 F.3d at 958; Rollins v. Massanari, 261 F.3d 853, 856-57 (9th Cir. 2001); Bunnell, 947 F.2d at 345.

To determine whether a claimant's testimony regarding the severity of his symptoms is credible, the ALJ may consider the following evidence: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or

22

inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; and (4) testimony from physicians and third parties concerning the nature, severity, and effect of the claimant's symptoms.  Thomas, 278 F.3d at 958-59; see also Smolen, 80 F.3d at 1284.

### 2.   Analysis.

In addition to the his pain problems, Plaintiff complained of mental health issues (based on his foul mood and stress), and alleged that he is unable to work in part due to headaches; hip pain; atrophy in his foot; and leg, foot, and ankle pain.[12]  (AR at 16.)

In determining Plaintiff's RFC, the ALJ made an adverse credibility ruling regarding Plaintiff's pain symptoms based almost exclusively on the same factors she used for rejecting the Treating Physicians' opinions, i.e., that his subjective symptoms were inconsistent with the medical evidence of record. (Id. at 13, 16-19.)  For the same reasons that the Court found the ALJ's reasoning to be without support to reject the Treating Physicians' opinions as discussed above, it finds the ALJ's credibility determination to be equally faulty.

Moreover, as previously discussed, to the extent the ALJ based her

---

[12]  The Commissioner argues that the ALJ properly rejected Plaintiff's mental impairments because he had never been treated for mental health issues; that Plaintiff did not complain that his alleged mental impairments affected his activities of daily living; that Plaintiff never complained of the numerous other physical ailments to his Treating Physicians; and that Plaintiff was never treated for the additional alleged physical impairments.  (JS at 26-27.)  The Court agrees that the ALJ properly rejected Plaintiff's complaints of mental health issues and additional physical impairments, as unsupported by the record.  (AR at 16.)  His allegations that he has difficulty sleeping because of his pain does find some record support, but there is no indication it affected his ability to work.  (See, e.g., id. at 237, 257.)

1   credibility determination on her argument that although the fact of Plaintiff's
2   back surgery lent support to the fact that his symptoms were genuine, this was
3   "offset" by the fact that the "surgery was generally successful in relieving the
4   symptoms," this reasoning improperly conflates Plaintiff's pre- and post-
5   surgical symptomology and is not a clear or convincing reason for discounting
6   Plaintiff's credibility.

7       Accordingly, the ALJ's credibility determination does not meet the clear
8   and convincing evidence standard, and it appears to this Court that the ALJ
9   arbitrarily discredited Plaintiff's testimony.

10  **D.   <u>Conclusion</u>.**

11      Based on the foregoing, the Court finds that the ALJ committed legal
12  error because she did not provide clear and convincing reasons for rejecting the
13  opinions of the Treating Physicians or for rejecting Plaintiff's subjective pain
14  testimony.

15  **E.   <u>This Case Should Be Remanded for Further Administrative</u>**
16       **<u>Proceedings</u>.**

17      The law is well established that remand for further proceedings is
18  appropriate where additional proceedings could remedy defects in the
19  Commissioner's decision.  <u>Kail v. Heckler</u>, 722 F.2d 1496, 1497 (9th Cir.
20  1984).  Remand for payment of benefits is appropriate where no useful purpose
21  would be served by further administrative proceedings, <u>Kornock v. Harris</u>, 648
22  F.2d 525, 527 (9th Cir. 1980); where the record has been fully developed,
23  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986); or where remand
24  would unnecessarily delay the receipt of benefits, <u>Bilby v. Schweiker</u>, 762 F.2d
25  716, 719 (9th Cir. 1985).

26      Although an extremely close call, the Court concludes that further
27  administrative proceedings might serve a useful purpose and remedy the
28  administrative defects discussed above.

1

**IV.**

2

**ORDER**

3
    Pursuant to sentence four of 42 U.S.C. § 405(g), IT IS HEREBY

4
ORDERED THAT Judgment be entered reversing the decision of the

5
Commissioner of Social Security and remanding this matter for further

6
administrative proceedings consistent with this Memorandum Opinion.

7

8
Dated: November 14, 2011

9
HONORABLE OSWALD PARADA
United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28